523 F.2d 543
 17 UCC Rep.Serv. 1227
 HOEFFERLE TRUCK SALES, INC., Plaintiff-Appellant,
v.
DIVCO-WAYNE CORP., et al., Defendants-Appellees.
AUGUST SCHMIDT COMPANY, Plaintiff-Appellant, Cross-Appellee,
v.
BOISE CASCADE CORPORATION, etc., Defendant-Appellee,
Cross-Appellant.
EASTLAND TRUCK SALES, INC., etc., et al.,
Plaintiffs-Appellants, Cross-Appellees,
v.
BOISE CASCADE CORPORATION, etc., Defendant-Appellee,
Cross-Appellant.
Jack FOGELMAN and Norman Fogelman, a partnership d/b/a J. A.
Fogelman Truck Sales and Service, Plaintiffs-Appellees,
v.
BOISE CASCADE CORPORATION, etc., Defendant-Appellant.
 Nos. 74-1481, 74-1765 to 74-1769.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 22, 1975.
Decided Oct. 6, 1975.
Rehearing Denied Nov. 7, 1975.
 
 William J. O'Brien, Jr., Chicago, Ill., for appellants.
 Victor E. Grimm, Chicago, Ill., for appellees.
 Before CUMMINGS, TONE* and BAUER, Circuit Judges.
 BAUER, Circuit Judge.
 
 
 1
 This consolidated appeal involves an action by four automotive dealers against the successor, by merger, of a truck manufacturer for breach of contract and other claims. Various jurisdictional and evidentiary issues are raised herein.
 
 
 2
 The facts of this case may be summarized as follows. The four dealers who brought suit are Eastland Truck Sales[1] ("Eastland") of Warren, Michigan, August Schmidt Company ("Schmidt") of Milwaukee, Fogelman Truck Sales and Service ("Fogelman") of East Chicago, Indiana, and Hoefferle Truck Sales ("Hoefferle") of Chicago. Each company sold and serviced lightweight trucks designed for multi-stop delivery purposes, such as house-to-house milk deliveries, manufactured by Divco-Wayne Corporation ("Divco") of Warren, Michigan. The relationship between each of the dealers and Divco was set forth in a contract known as the "Dealer Memorandum" which contained provisions, among others, enabling either party to terminate the dealership upon proper notice, obligating Divco to fill only those truck orders which it accepted, warranting new trucks sold by Divco to be free from defects in material and workmanship, and providing for the return of usable parts upon termination of the agreement. Divco also maintained the separate policy of allowing each dealer to return a percentage of gross inventory of parts annually.
 
 
 3
 Without terminating any of the dealerships, Divco agreed to sell its truck manufacturing facilities to Highway Products, Inc., in August of 1967 while almost simultaneously sending notice to each of its dealers that it had no intention of going out of business and would be resuming its manufacturing operations, which had been recently curtailed, in the near future. The sale was consummated in November of 1967, shortly after which Highway Products resold the facilities to a second purchaser, Transairco, Inc. Transairco announced its purchase in January of 1968; the evidence on whether the plaintiffs actually knew of the sale before that date is conflicting. Although Divco no longer manufactured trucks, it continued to supply dealers with some parts and to accept a limited number of parts returned for credit or pursuant to its warranty policy until November 1, 1968, at which time it gave notice that it would assume no further responsibility. Subsequent to that date, the plaintiffs entered new dealership agreements with Transairco. In the meanwhile, however, beginning early in 1967, materials and workmanship of Divco products fell off significantly, and the dealers began having trouble returning parts for credit or under warranty. There was also more than a two year time lag between the time Divco shut down its manufacturing operations in 1967 and when Transairco began producing trucks with any sort of efficiency in 1969. These problems led to the filing of this consolidated suit against Divco, Highway Products, Transairco, and Boise Cascade Corporation ("Cascade") which merged with and assumed the liabilities of Divco in early 1968.
 
 
 4
 Suit was filed on October 28, 1970, and by amended complaint the plaintiffs alleged breach of the Dealer, Memorandum and violation of the "Automobile Dealers Day in Court Act," 15 U.S.C. § 1221 Et seq. A trial on the issue of liability only was held in June and July of 1973, and the jury returned verdicts finding that Divco had breached its contract with all four of the plaintiffs. On defendants' motion, verdict was directed against the plaintiffs on the federal cause of action and in favor of Highway Products and Transairco on the issue of liability; none of these directed verdicts have been appealed. In February, 1974, a trial was had on the issue of damages, during the course of which a directed verdict was entered against Hoefferle. The jury returned special verdicts in each of the other cases, however, awarding various amounts (a) for failure of Divco to reimburse for parts returned according to agreement, (b) for failure to reimburse under the warranty agreement, (c) for failure to deliver trucks whose orders had been accepted by Divco, and (d) for expenses incurred by reason of the delay of Divco in delivering trucks on order.[2] After trial, the district court granted Cascade's post-trial motion to set aside the entire verdict in favor of Eastland on the ground of lack of subject matter jurisdiction. The court also entered an alternative ruling reducing Eastland's award of $10,030 for warranty claims (item (b)) to $2,382 and setting aside its award for trucks on order (item (c)) in its entirety. In addition, the court set aside the award for trucks on order (item (c)) in favor of Schmidt.
 
 
 5
 The case as it presently stands involves the following appeals: Eastland appeals both the district court's ruling that it lacked jurisdiction of the subject matter and its alternative decision reducing or setting aside items (b) and (c). Schmidt appeals the judgment setting aside item (c) of the jury verdict. Cascade appeals the final judgments entered in favor of Fogelman on item (c) of the verdict, cross appeals the final judgment entered in favor of Schmidt on item (d) of the verdict, and cross appeals the alternative ruling of the district court in the Eastland case should we reach that question. Hoefferle appeals the verdict directed against it in the damage trial. We shall consider first the Eastland jurisdictional claim, then the damage issues by category, and finally the merits of the Hoefferle appeal.
 
 Jurisdiction of the Eastland Suit
 
 6
 By its amended complaint dated June 26, 1973, Eastland alleged that it was a citizen of Michigan, that Divco was a citizen of Michigan, and that Cascade was a citizen of Delaware and Idaho.[3] Also contained in the amended complaint were allegations that Divco had merged with Cascade on October 26, 1967,[4] and that Cascade had assumed all manufacturing liabilities. Each of these allegations was admitted or proven at trial. Neither the original nor the amended complaint, however, alleged that jurisdiction was predicated upon 28 U.S.C. § 1332, diversity of citizenship.
 
 
 7
 Shortly after the damage verdicts were returned, the district court ruled that final judgment extended only against Divco and that diversity of citizenship was therefore lacking. The court also decided that since jurisdiction under the "Automobile Dealers Day in Court Act" had been disposed of adversely to plaintiffs during the liability trial, it would not exercise pendent jurisdiction over the state law breach of contract claims. On appeal, Eastland urges that the district court erred both in ruling that it had no subject matter jurisdiction and in refusing to exercise pendent jurisdiction. Cascade, on the other hand, argues that since Eastland insisted on retaining Divco as a party defendant throughout the course of these proceedings, even after being alerted by the court of possible jurisdictional problems, it is estopped from claiming Divco is not a proper party. Cascade also maintains that the court acted within its discretion in refusing to exercise pendent jurisdiction. Since we conclude that the trial court erred in its ruling on diversity, we do not reach the pendent jurisdictional issue.
 
 
 8
 It is fundamental that diversity is determined as of the time suit is commenced. Julien v. Sarkes Tarzian Inc., 352 F.2d 845, 846 (7th Cir. 1965). Similarly, the proposition that separate corporations lose their separate identity after merger is too evident for much discussion. This is the result under the laws of both Michigan and Delaware. Michigan law effective at the time of merger provided that:
 
 
 9
 "any 1 or more corporations . . . and any 1 or more foreign corporations may . . . merge into a single corporation which may be any 1 of the constituent corporations . . . as shall be specified in the agreement hereinafter required", Mich.Stat.Ann. § 21.52;
 
 
 10
 and further that:
 
 
 11
 "(w)hen said agreement shall have become effective, the separate existence of all of the constituent corporations, or all such constituent corporations except the resulting corporation, shall cease, and the constituent corporations shall become a new corporation, or be consolidated or merged into 1 of such corporations in accordance with said agreement." Mich.Stat.Ann. § 21.53.
 
 Relevant Delaware law provides:
 
 12
 "When any merger or consolidation shall have become effective under this chapter, for all purposes of the laws of this State the separate existence of all the constituent corporations, or of all such constituent corporations except the one into which the other or others of such constituent corporations have been merged, as the case may be, shall cease and the constituent corporations shall become a new corporation, or be merged into 1 of such corporations, as the case may be . . . ." 8 Del.Code Ann.Tit. 8, § 259.
 
 
 13
 This latter provision, in fact, has been interpreted to mean that after a foreign corporation merges into a Delaware corporation, the surviving corporation for diversity jurisdiction is a citizen of Delaware. Akwell Corp. v. Eiger, 141 F.Supp. 19, 21 (S.D.N.Y.1956).
 
 
 14
 Under the laws of both Michigan and Delaware the separate existence of Divco thus ceased when it merged with Cascade. Naming Divco as a defendant consequently had no effect upon diversity jurisdiction between Eastland, a citizen of Michigan, and Cascade, a citizen of Idaho and Delaware. Cascade's argument that Eastland should be estopped from denying that Divco is a real defendant is meritless. Since Divco ceased to exist prior to the commencement of this suit, the court could never have acquired jurisdiction over it except through its successor in interest.
 
 
 15
 Although Eastland did not allege jurisdiction under 28 U.S.C. § 1332, we think that its complaints are sufficient for a court to determine that jurisdiction was conferred upon it under that section, even without further amendment. See Quality Beverage Co., Inc. v. Sun-Drop Sales Corp. of America, 291 F.Supp. 92, 95 (E.D.Wis.1968); Arndt v. Bank of America, 48 F.Supp. 961, 964 (N.D.Calif.1943). A court's discretion to dismiss for lack of subject matter jurisdiction when the plaintiff could have pleaded the existence of jurisdiction and when in fact such jurisdiction exists, should be exercised sparingly. See Littleton v. Berbling, 468 F.2d 389, 394 (7th Cir. 1972), Rev'd on other grounds sub nom. O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Under the circumstances of this case, with two trials having been conducted without this possible defect in the complaints raised as an issue, it would be highly inappropriate to dismiss when diversity jurisdiction is actually present.
 
 
 16
 Eastland Breach of Warranty Claims (Item (b))
 
 
 17
 Eastland contends that it was error for the trial court in its alternative ruling to set aside the jury's award of $10,030 for the failure of Divco to meet its warranty obligations and to enter judgment n. o. v. for $2,382.38. We agree with the trial court that the larger verdict was not supported by the evidence.
 
 
 18
 The larger figure of $10,030 is the sum of the entries under "new truck warranty expense" for the fiscal years 1967, 1968 and 1969 as recorded on Eastland's income statements for those years. The smaller figure is the sum of warranty claims for these years actually submitted to the Divco factory for reimbursement and rejected. All such warranty claims, including the individual customer's name and Eastland's cost of parts and labor required for installation, were listed separately in plaintiff's Exhibit No. 23 (PX 23). Claims paid by Divco were noted by drawing a line through them. Eastland's accountant testified that the entries on the income statement similarly consisted of the difference between the amounts turned in as warranty expenses and the amounts actually paid, yet he never explained the some $7,600 discrepancy. He did testify, however, that PX 23 was the most accurate of the two records of warranty expenses. Eastland's president also testified that PX 23 represented all the items actually submitted to Divco for reimbursement; he further explained that certain additional items the plaintiff did not think warrantable were nonetheless absorbed by Eastland, which might explain the reason for the size of the income statement entries. The income statement also reflected warranty expenses for claims on new trucks from another company with which Eastland dealt, International Harvester. These latter expenses were not recorded separately for two of the three years, a fact which casts further doubt upon the income statement's validity as a measure of Eastland's warranty damages. Eastland attempts to explain the discrepancy between the income statement and PX 23's totals by pointing out that the latter only recorded the unpaid warranties from its "east side office" while the former accumulated the totals for all three of its offices. This explanation is inadequate, however, inasmuch as all three of the income statements indicate that they record data only from the east side office. In short, the evidentiary support for Eastland's claim of $10,030 for breach of warranty is legally insufficient.
 
 Profit Damages (Item (c))
 
 19
 The trial court set aside the jury's damage award of $76,000 to Eastland and $33,000 to Schmidt for lost profits caused by the failure of Divco to deliver trucks ordered by these plaintiffs and accepted by Divco, on the ground that the plaintiffs had failed to prove that the accepted orders were not eventually filled by the successor of Divco's truck facilities, Transairco. The award of $13,500 to Fogelman in the same category, however, was not disturbed. Since the evidence with regard to lost profits of all three plaintiffs was very similar, both sides contend that the trial court committed fatal error. The defendant argues, in addition, that neither the liability verdict nor the evidence at the damage trial supported damages for lost profits. All three plaintiffs sought and received damages for profits lost on the sale of new trucks as well as in the loss of after-market (servicing, repairs, sale of parts, etc.) sales.[5]
 
 
 20
 The defendant's argument that damages for the trucks on order were not supported by the liability verdict may be readily disposed of. The verdicts returned in the liability trial, to be sure, were of a general nature stating simply that Divco had violated the contract with each of the plaintiffs. Included in the court's issue charge to the jury, however, was the following:
 
 
 21
 "Each plaintiff claims that the defendant was guilty of wrongful conduct in breaching the terms of the franchise agreement in one or more of the following respects:
 
 
 22
 By failing to manufacture, distribute and sell trucks which were on order . . . and (which) had been accepted by the defendant in Detroit when defendant sold the manufacturing facilities."
 
 
 23
 It is true that the court's burden of proof instruction contained nothing specific about lost profits, but no objection to this was raised by the defendant. Moreover, there was evidence presented at the liability trial concerning loss of profits, and the liability judgment was never appealed. In any event, we think that the evidence introduced was sufficient to sustain liability for the loss of profits and that submission of the lost profits issue to the damage jury was not error.
 
 
 24
 This conclusion, of course, does not fully reach the correctness of the district court's decision to set aside the damage verdicts. That decision was based upon testimony by representatives of all three plaintiffs that some or all of the pending truck orders were turned over or resubmitted to Transairco, the eventual purchaser of Divco's manufacturing facilities, and later filled. But even if the plaintiffs received from Transairco trucks of the same specifications they had ordered from Divco, the liability jury was not precluded from concluding, as it apparently did, that Divco's abdication of its responsibilities and the two year delay in delivery amounted to a breach of contract. With liability thus established, the question of the extent or measure of damages is not a difficult one. Eastland's sales, after all, had averaged over 20 per month in the years before Divco ceased its manufacturing operations; Schmidt had sales of around 80 per year; and Fogelman's were about 25 per year. By every indication, this volume would have continued, subject only to available sources of supply. Transairco, though, had no obligation to accept Divco orders, and its subsequent sales to the plaintiffs would, in all likelihood, have been forthcoming regardless of the precise specifications of the trucks delivered. In such circumstances, damages for the dealers' lost profits on truck orders accepted by Divco and which Divco therefore had an obligation to deliver were wholly proper. Cf. Uniform Commercial Code §§ 2-712, 2-715.
 
 
 25
 In addition, there was sufficient evidence to sustain the damage award for loss of after-market profits. This took the form of uncontroverted testimony of prior and subsequent sales data concerning trucks and parts. Though no precise figure was ever distilled with respect to these prospective damages (except at closing argument), the evidence was nonetheless adequate to form a basis from which the jury could have estimated the damages. Cf. Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 565 (2d Cir. 1970). We thus affirm the district court on the issue of lost profit damages as to the plaintiff Fogelman and reverse it with respect to Eastland and Schmidt, reinstating the jury's original verdict.
 
 Delay Damages (Item (d))
 
 26
 Not only did the trial court rule that damages for lost profits were not awardable since the truck orders were later filled, it also held that these damages were "inextricably commingled" with damages awarded for expenses incurred due to Divco's delay in delivering trucks on order. Consequently, reasoned the court, since Eastland and Schmidt, who received awards for both items, were required to elect between the two, each would prefer the larger award. It thus sustained the $95,000 and $44,000 awards given by the jury to these plaintiffs, respectively, as delay damages. The plaintiffs contend on appeal that the damages awarded were not duplicative but were in fact for different periods of time, and that the latter award represented a portion of their overhead on needless expenditures (such as maintaining additional employees) in anticipation of future truck sales, all of which could have been avoided had Divco not fraudulently misrepresented its intention to resume manufacture in August of 1967. The defendant takes the position that damages for delay were not supported by the plaintiffs on such a theory of fraud nor by the evidence at the damage trial. It also suggests that such damages are in conflict with the verdicts of the liability trial, but since we agree with the defendant in its former argument, we do not reach this latter point.
 
 
 27
 The court's instructions at the damage trial, as well as the jury verdicts, covered the plaintiffs' expenses for delay only with regard to trucks on order. The charge states that the plaintiffs were entitled to damages for:
 
 
 28
 "(t)he value of the unnecessary operating expenses incurred by the plaintiffs by reason of the delay of defendant to deliver trucks that plaintiffs had on order and which were accepted by the defendant."
 
 
 29
 The special verdicts of the jury for Eastland and Schmidt awarded damages:
 
 
 30
 "(f)or reasonable operating expenses incurred by this dealer by reason of the delay of the Defendant to deliver certain Divco trucks on order which were accepted by said Defendant."
 
 
 31
 The plaintiffs admit that the damages actually awarded were based upon their computations (the only figures submitted for jury consideration) of excess operating expenses for a period subsequent to that for which the expenses for taking these orders would have been incurred. They attempt to reconcile this fact with the instructions and verdicts by explaining that the jury, in effect, saw through a misleading charge, to which the plaintiffs had registered a timely objection, and awarded damages for separate periods of time. But the jury was not free to disregard the court's instructions and the plaintiffs do not contend otherwise. Nor do they argue that the case should be remanded for a new trial under proper instructions. The period for which the damages were awarded, moreover, "presumably 1968" according to the plaintiffs, was one in which the plaintiffs by their own acknowledgement were aware that the Divco truck facilities had been sold and in which their expenses incurred as a result of representations to the contrary would therefore have no basis. The delay damages awarded Eastland and Schmidt accordingly must be set aside.
 
 Hoefferle's Dismissal
 
 32
 Like the other plaintiffs, Hoefferle sought damages for wrongfully rejected parts, warranty expenses, lost profits for trucks on order but never delivered, and expenses incurred for delay in delivery and false representations by Divco. Clarence Hoefferle, the manager of the company, however, suffered a stroke in 1969, was unable to testify at the liability trial, and died shortly thereafter. His wife, Dolly, who ran the business after her husband's stroke, died prior to the liability trial. As a consequence, most of the records necessary to establish the extent of this company's injury could not be located, and upon motion of the defendant the case was dismissed at the damage trial at the close of the plaintiff's evidence. The company here claims that its circumstantial evidence presented at trial was a sufficient measure of damages to allow it to get to the jury. We agree with the trial court that it was not.
 
 
 33
 As to the first two items of damages, Hoefferle does not press them seriously and the evidence was, as the trial court held, very much lacking with regard to the sufficiency of proof. There was testimony by the plaintiff's witnesses that Divco treated all dealers the same in its returned parts and warranty policies. But Hoefferle's parts manager, other than indicating that the value of parts on hand for 1967 was between $175,000 and $200,000, testified only that a number of parts returned to the factory were rejected as obsolete, and gave no estimate as to those which he felt were wrongfully refused. As to warranty claims, Hoefferle submitted paid and unpaid warranty claims for the months of December 1967 and January 1968 as evidence of claims wrongly refused for a typical two month period, from which Hoefferle attempted to extrapolate its damages for three years. There was no evidence as to why the claims were rejected for these two months. The district court ruled the exhibits inadmissible since they were presented for the defendant's consideration only two days before they were introduced into court. We think, in addition, that the exhibits did not form a sufficient basis from which damages could be calculated.
 
 
 34
 With respect to damages for trucks on order, Hoefferle offered evidence, through its accountant and a letter written by Mrs. Hoefferle, that from 1964 through 1966 the company had sold not less than 110 trucks per year and that in 1967 Divco had supplied Hoefferle with only 67 trucks. This creates the inference, says the plaintiff, that at least 43 trucks were on order in that year which were never delivered. There is no evidence, however, to indicate which of several different-priced models these orders might have been for; rather, Hoefferle calculates the extent of its injury by reference to testimony from other plaintiffs that a reasonable net profit was $1000 per truck. Nor is there evidence that Divco actually accepted the orders which, under the Dealer Memorandum, would be a prerequisite to its liability. Hoefferle instead asserts that Divco had exclusive control of the master list which showed the number of trucks each dealer had on order when Divco defaulted and that the present defendant, Cascade, refused to produce the list and should not be heard to complain of Hoefferle's method of proof. Cascade counters that all orders placed with Divco were turned over to Transairco and that no document request on Transairco was ever made despite the fact that it was originally a party defendant.
 
 
 35
 In any event, the district court denied the offer and we think it was correct in doing so. It is true, of course, as Hoefferle points out and as we have held above, that damages need not be calculated with mathematical precision. It is also most unfortunate that the deaths of Clarence and Dolly Hoefferle may have the effect of precluding the recovery of damages which rightfully belong to their company. But as disagreeable as this result may be, it does not vitiate the rule that damages must be proved with at least a reasonable degree of certainty, Classic Bowl, Inc. v. AMF Pinspotters, Inc., 403 F.2d 463, 467 (7th Cir. 1968), which we do not here perceive. The admitted fact of damages, moreover, as presumably established by the liability trial, will not suffice to prove the amount of damages. See Clapper v. Original Tractor Cab Co., 165 F.Supp. 565, 581-582 (S.D.Ind.1958), Rev'd on another issue, 270 F.2d 616 (7th Cir. 1959), Cert. denied, 361 U.S. 967, 80 S.Ct. 588, 4 L.Ed.2d 547 (1960). The evidence, in short, created little more than a speculative inference of the extent of Hoefferle's injury, and it was therefore properly excluded.
 
 
 36
 Hoefferle stands in a slightly different position from Eastland and Schmidt with regard to its claim for delay damages. Unlike these latter two companies, Hoefferle seeks to remand, whereupon, it would seem, proper instructions could be tendered to and given by the trial court. Nevertheless, the testimony it has offered to prove delay damages, in addition to being significantly weaker, is similar in form and content to that heard by the district court in the other cases, and, in light of the inconsistency between the alleged reliance upon Divco's promises of renewed production and the admitted knowledge by early 1968 that its facilities had been sold, we think that a remand on this claim would likewise be improper.
 
 
 37
 One further matter merits our attention: Plaintiffs' brief contains what we believe to be a wholly unwarranted attack upon the integrity and impartiality of the trial judge. Judge McMillen, before trial, advised plaintiffs that Cascade had been his client for some years prior to the time he was appointed to the federal bench, and offered them the opportunity to move for a change of venue. Plaintiffs declined the opportunity at that time but on appeal accuse the judge of abusing his judicial power, of becoming a biased adversary, and of indulging in "kindergarten mental gymnastics." There is nothing in the record to substantiate these charges.
 
 
 38
 We are fully aware of the pressures upon trial lawyers and appellate advocates to raise every conceivable argument in favor of their client's case. Such zeal and perseverance are the nuts and bolts of our adversary system and we encourage the members of the bar to fully explore every legitimate claim in a case. We cannot, however, tolerate unscrupulous attacks upon the impartiality of trial judges. Undoubtedly, trial counsel, having received favorable jury verdicts, were distraught by the judge's post-trial action. But personal lambasts against the integrity of a trial judge, absent specific evidence in the record to support such an allegation, is unprofessional, always in poor taste, and a distraction from a clear discussion of the merits of any appeal.
 
 
 39
 Affirmed in part, reversed in part.
 
 
 
 *
 Tone, Circuit Judge, was a member of the panel originally assigned to hear the case but after oral argument discovered a fact he deemed to be cause for disqualification and thereupon recused himself and took no part thereafter in the consideration or decision of the case
 
 
 [1]
 R. F. Carion, Eastland's principal executive officer, was added as a plaintiff in the Eastland counts of the amended complaint as assignee of part of Eastland's cause of action. For the sake of simplicity, only Eastland will be referred to in this opinion. He is a citizen of the same state as Eastland for purposes of diversity discussed below
 
 
 [2]
 The following damages were ascribed by the jury in each of these categories:
 Eastland Schmidt Fogelman
(a) Parts $ 5,000 $ 0 $ 1,600
(b) Warranty 10,030 0 0
(c) Truck Orders 76,000 34,000 13,500
(d) Delay 95,000 44,000 0
 
 
 [3]
 The citizenships of Highway Products and Transairco were completely diverse and do not affect the issue on this appeal. Divco-Wayne Corporation of Delaware, a corporation organized and controlled by Cascade, was also named as a defendant in the amended complaint, but it, along with Cascade, bore Delaware citizenship and we do not treat it separately
 
 
 [4]
 The merger agreement was actually executed on January 23, 1968, and entered on October 26, 1967
 
 
 [5]
 Damages sought for losses in new truck and after-market sales by each of the plaintiffs may be summarized as follows:
 Eastland: net profit for 53 trucks on order $50,092
 after-market profits loss 26,500
 -------
 total loss 76,592
 Jury award (item (c)) 76,000
 ------------------------------------------
Schmidt: net profit for 28 trucks on order $19,982
 after-market profits loss 14,000
 -------
 total loss 33,982
 jury award (item (c)) 33,000
 ------------------------------------------
Fogelman: net profit for 9 trucks on order $ 9,300
 after-market profits loss 4,500
 -------
 total loss 13,800
 jury award (item (c)) 13,500