**HARBOR HOUSE CONDOMINIUM ASSOCIATION and Unit I Corporation, Plaintiffs,**

v.

**MASSACHUSETTS BAY INSURANCE CO., Defendant.**

No. 85 C 4622.

United States District Court, N.D. Illinois, E.D.

Dec. 29, 1988.

---

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

Plaintiffs, Harbor House Condominium Association and Unit I Corporation, instituted this action against defendant, Massachusetts Bay Insurance Company, seeking indemnification pursuant to a casualty insurance policy which defendant issued to plaintiffs. The insurance policy insured plaintiffs against all risks of direct physical loss. Cold weather caused freeze damage to a portion of the pipes of the perimeter heating system in plaintiffs' condominium building. Although defendant paid for the damage which was located and repaired by plaintiffs, plaintiffs now seek the replacement cost of the entire perimeter heating system. Presently pending before the Court is defendant's motion for summary judgment.

### II. FACTS [1]

Plaintiffs are the collective owners of the common areas of a condominium building located in Chicago, Illinois. The twenty-eight story building, which is approximately twenty years old, contains 278 individual condominium units. Defendant issued an "all risk" insurance policy ("the Policy") to plaintiffs covering, *inter alia*, direct physi-

---

1. The facts described herein are undisputed un- less otherwise stated.

cal damage to the "fixtures, machinery and equipment constituting a permanent part of and pertaining to the service of the building."[2] The Policy provided coverage from May 3, 1981 through May 3, 1984.

The plaintiffs heated the building partially through the use of a perimeter heating system ("the System") which contained hot water pipes that ran along the inside of the building's exterior walls. On December 19, 22, and 25, 1983, cold weather caused a portion of the hot water pipes to freeze, crack and burst. As a result, damage occurred to the interior of several individual condominium units.

In January, 1984, plaintiffs, through the general contractor of the building, hired the engineering firm Wallace, Migdal and Associates, Inc. ("Wallace") for the purpose of overseeing repairs to the System. Wallace then hired an engineering and contracting company, Air Comfort Corporation ("Air Comfort"), for the purpose of locating and repairing leaks in the hot water pipes of the System.

From January through March, 1984, Air Comfort located and repaired those leaks in the pipes which, according to plaintiffs' expert James B. Alwin,[3] were "easily identified". Such leaks were easily identified because the pipes were exposed or because water damage to the walls and surrounding areas indicated problems behind the walls. (Alwin deposition at 25–26.) In his reports to plaintiffs, Alwin indicated that Air Comfort repaired pipes in seventeen of the indi-

vidual units. (Alwin letters to Harbor House Condominium Association dated February 6, 1984 and March 12, 1984, respectively.) Based on his visual observation of those pipes,[4] Alwin concluded that the leaks were caused by frozen water. Plaintiffs' other expert, Gabriel Reisner,[5] testified that the north section of the Building contained the most obvious leaks, and that Air Comfort attacked only this "tier." (Reisner deposition at 41, 88.)

Both Alwin and Reisner concluded that the only way they would be able to locate smaller leaks in the pipes would be through the use of an air pressure test. (Alwin first affidavit at 3–4; Reisner deposition at 27–28.) Air pressure testing involved draining the water from the pipes and then introducing air pressure through the use of an air compressor. A "hissing" noise behind the wall would indicate the existence of a leak. (Alwin deposition at 70–71.) Air Comfort performed this test on the entire system and repaired some additional leaks. (Alwin deposition at 72–73.) However, the pipe system failed to hold enough air pressure to test the entire system. (Alwin deposition at 76.)

Next, the engineers attempted to test smaller portions of pipes by utilizing isolation valves.[6] This test involved closing isolation valves at either end of a given portion of pipe and then introducing air pressure. (Alwin deposition at 77–78.) This test also proved ineffective because the isolation valves failed to prevent pres-

2. Coverage "A" of the Policy.

3. Plaintiffs' expert James B. Alwin is a licensed professional engineer. Also an employee of Air Comfort, he was given responsibility for overseeing the repairs to the System.

4. Alwin stated, "[t]here is no doubt that the leaks encountered were caused by the freezing temperatures because I observed longitudinal cracks in the pipes. When the water in the pipes starts to freeze the ice expands along the length of the pipe. When the ice cannot expand any further in that direction, it starts to expand outward putting pressure on the pipes. When the pressure becomes too great the pipe splits like a seam. Any other cause, such as corrosion, would not result in this type of crack, but a leak more like a hole." (Alwin, first affidavit at 3.)

5. Mr. Reisner is a consulting engineer and the president of Wallace, Migdal and Associates. The general contractor of Harbor House Condominium contacted him in January, 1984 to help oversee Air Comfort's repair of the Harbor House heating System. (Reisner deposition at 18–19.)

6. Isolation valves are gate-like valves installed in a piping system as it is constructed. Usually installed for maintenance purposes, the pipes in each condominium unit of the Building contained approximately two isolation valves. The purpose of such valves is to isolate a portion of the pipes. When one closes the valves at both ends of a given section of pipe, water and/or air are prevented from escaping from that section of pipe. (*See* Alwin deposition at 79.)

surized air from escaping into the entire System. (Alwin deposition at 78–79.) In his March 5, 1984, report to Wallace, Alwin indicated that leaks in the isolation valves prevented further testing. (Alwin letter to plaintiffs dated March 5, 1984 at 1.)[7]

Defendant then authorized plaintiffs to replace the isolation valves in six condominium units for the purpose of further testing. (Alwin letter of March 12, 1984.) The Building management company selected six units for air pressure testing. Plaintiffs do not argue, and the evidence does not suggest, that the Building management company randomly selected the six units for testing.[8] After replacing the isolation valves in those six units, Air Comfort pressure-tested the pipes and repaired all additional leaks in those units. (Alwin deposition at 96.) Thus, as of the inception of this lawsuit, plaintiffs had located and repaired pipes in twenty-three of the Building's 278 units. Defendant paid $566,000 to plaintiffs, representing the total cost of pipe repair and consequential damage in those twenty-three units.[9]

Neither party conducted further pressure testing. Plaintiffs have not located or repaired any pipes which may be leaking in any of the remaining 255 units to which the System provided heat. Instead, plaintiffs finally abandoned the System and sought alternative methods for heating the Building. In this lawsuit, plaintiffs seek to recover the actual cash value of the entire System.

---

7. Specifically, Alwin stated, "[w]e recommend that 828 existing fin tube isolation valves be replaced with ⅞" sweat valves, that nine existing 2½" gate valves be replaced, and that nine 2½" plug valves be replaced in order to allow us to perform a proper test." (Alwin letter to plaintiffs dated March 5, 1984 at 1.)

8. The only evidence in the record concerning the process used by the Building management company in selecting the six units appears in Alwin's deposition where he stated, "[the six units] were identified by [the Building management company]. They were specific units that had, I guess, more complaints than others, et cetera, or else more pressure put on them by the owners." (Alwin deposition at 94.) When asked whether the units were selected randomly, Alwin replied, "No." *Id.*

## III. ANALYSIS

### A. Summary Judgment Standards

The party moving for summary judgment bears the initial burden of establishing the lack of a genuine issue of material fact. *E.g., Flip Side Productions, Inc. v. Jam Productions, Ltd.,* 843 F.2d 1024, 1031 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). However, the moving party may meet its burden without coming forward with affirmative evidence to negate the non-movant's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed. 2d 265 (1986). Where, as here, the non-movant has the ultimate burden of proof at trial, the movant need only indicate to the court the absence of evidence to support the non-movant's claim. *Id.* at 325, 106 S.Ct. at 2554. If the non-movant has failed to make a sufficient showing as to an essential element of its case, all other facts are immaterial. *Id.* at 322–23, 106 S.Ct. at 2553. Thus, when a defendant moves for summary judgment citing the insufficiency of a plaintiff's evidence, the district court considers the motion under a standard similar to that of a directed verdict. *Id.* With these precepts in mind, the Court proceeds to the merits of defendant's motion for summary judgment.

### B. Causation

▉ Coverage under an "all risk" insurance policy extends only to a loss caused by a fortuitous event.[10] *Mattis v.*

---

9. Plaintiffs applied $75,712.16 to the actual repair cost of the pipes. The rest of the money applied to damages to the Building and individual units. (*See* Alwin first affidavit at 4–5.)

10. [A fortuitous event is] an event which so far as the parties to the contract are aware, is dependent on chance. It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event ... provided that the fact is unknown to the parties.

*Mattis v. State Farm Fire & Casualty Co.,* 118 Ill.App.3d 612, 623, 73 Ill.Dec. 907, 915, 454 N.E.2d 1156, 1164 (5th Dist.1983) (*quoting* Restatement of Contracts § 291 Comment a (1932)). Damage due to causes such as known pre-existing problems would not be fortuitous.

*State Farm Fire & Casualty Co.*, 118 Ill. App.3d 612, 621, 73 Ill.Dec. 907, 914, 454 N.E.2d 1156, 1163 (5th Dist.1983). The insured must prove both that a loss occurred and that the loss was a result of a fortuitous event. *Texas Eastern Transmission v. Marine Office—Appleton & Cox Corp.*, 579 F.2d 561, 564 (10th Cir.1978). In order to withstand a defendant's motion for summary judgment, the plaintiff must present sufficient evidence as to each of these two elements to permit a reasonable jury to return a verdict in the plaintiff's favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Although it is not clear that the pipes sustained any further damage, defendant does not dispute the existence of any such further damage for purposes of this motion. A dispute does exist, however, with respect to the cause of that damage. Unlike a plaintiff who asserts a loss under a "specific risk" policy, a plaintiff claiming damage under an "all risk" policy need not prove the exact cause of his damage. *Morrison Grain Co. v. Utica Mutual Fire Ins. Co.*, 632 F.2d 424, 430 (5th Cir.1980). However, the plaintiff must establish that the loss occurred as a result of a fortuitous event. *Morrison Grain*, 632 F.2d at 430–31, *Texas Eastern Transmission v. Marine Office—Appleton & Cox Corp.*, 579 F.2d 561, 564 (10th Cir.1978), *Standard Structural Steel Co. v. Bethlehem Steel Corp.*, 597 F.Supp. 164, 193 (D.Conn.1984).

In *Mattis v. State Farm Fire & Casualty Co.*, 118 Ill.App.3d 612, 73 Ill.Dec. 907, 454 N.E.2d 1156 (5th Dist.1983), the plaintiff sought indemnification from the defendant insurer under an "all risk" insurance policy for structural damage to, *inter alia*, a basement wall situated below ground level. The defendant denied liability, claiming that the plaintiff's damage resulted from sub-surface water pressure, a

peril which was specifically excluded from coverage. *Id.* at 617–18, 73 Ill.Dec. at 911, 454 N.E.2d at 1160. The defendant's evidence consisted of the testimony of two expert witnesses. The defendant's first expert, an architect, failed to perform soil tests to determine the presence of water; however, he concluded that "hydrostatic pressure 'could have contributed'" to the structural damage. *Id.* at 618, 73 Ill.Dec. at 911–12, 454 N.E.2d at 1160–61. The defendant's other expert, a structural engineer, also failed to perform soil tests, but he too concluded that hydrostatic pressure could have contributed to the damage. *Id.*, 73 Ill.Dec. at 912, 454 N.E.2d at 1161. In finding that the defendant did not meet its burden of establishing the cause of the damage,[11] the court held that without performing the proper tests, the conclusions drawn by the defendants' experts were nothing more than speculation. *Mattis*, 118 Ill.App.3d 612, 618, 73 Ill.Dec. 907, 912, 454 N.E.2d 1156, 1161.

Similarly, in the instant case, plaintiffs' experts failed to perform air pressure tests for the purpose of locating pipe damage which is the subject of this lawsuit. Each of plaintiffs' experts testified that once he locates damaged pipe, a visual inspection of the pipe is necessary to determine the cause of that damage. (Alwin deposition at 87–88, 102, Reisner deposition at 15–16). In fact, Air Comfort utilized this procedure in determining the cause of damage to pipes in the twenty-three units previously repaired and paid for by defendant. (*See* Alwin first affidavit at 3). However, plaintiffs' experts have not visually inspected any of the pipes for which plaintiffs now seek recovery; indeed, plaintiffs failed even to locate any additional damaged pipe.

Alwin concluded that there is additional damage to the pipes because the System will not hold air. (Alwin first affidavit at

---

11. In *Mattis*, the defendant claimed that the cause of plaintiffs' loss was a peril specifically excluded under the policy. *Mattis*, 73 Ill.Dec. 907, 911, 454 N.E.2d 1156, 1160. Accordingly, the defendant had the burden of establishing that water pressure caused plaintiffs' damage. *Id.* In the instant case, defendant does not assert that the cause of the damage to the pipes

in the System resulted from an excluded peril. Defendant claims that plaintiffs fail to attribute their damage to *any* cause. Although plaintiffs need not establish the exact cause, they have the initial burden of presenting evidence which tends to show that their damages resulted from a fortuitous event.

4). Alwin's deposition testimony undermines this conclusion, because he indicates that bad valves may also account for lost air pressure within the System. (Alwin deposition at 65–66). Thus, in the absence of an air pressure test and a subsequent visual inspection of any damaged pipe, the record contains no competent evidence of additional pipe damage, let alone damage attributable to freezing. Plaintiffs' expert testimony, like that of the defendant in *Mattis*, is based solely on pure speculation. Although it is unnecessary for plaintiffs to prove specifically that freezing was the cause of the pipe damage, plaintiffs must establish that the occurrence of a fortuitous event resulted in additional pipe damage. Without even locating that damage, plaintiffs are unable to present sufficient evidence for a reasonable jury to conclude that any fortuity caused damage to the pipes.

Furthermore, the fact that freeze damage occurred to a small portion of the pipes within the System, is alone insufficient to attribute damage within the entire System to the same cause. The evidence indicates that Air Comfort found and repaired obvious pipe damage only on the north side of the Building. (Reisner deposition at 41, 88). That damage occurred in only seventeen of the Building's 278 units. When Air Comfort performed the air pressure test on an additional six units, those units were not randomly selected. *See supra*, note 8. Therefore, plaintiffs established freeze damage in only twenty-three units without locating pipe damage in any of the remaining 255 units. The fact that freezing caused damage to a portion of the heating System is probative of the cause of damage to the entire System only if the record evidence indicates that the damaged portion is representative of the entire heating System. The record contains no such evidence. Even viewed in the light most favorable to the plaintiffs, plaintiffs have not presented sufficient evidence to allow a reasonable jury to find that a fortuitous event caused leaks not located or visually inspected by plaintiffs or their experts. Plaintiffs have thus failed to establish the existence of a disputed issue of fact with respect to causation, and defendant is entitled to summary judgment.

### C. Damages

As an alternative ground for summary judgment, defendant argues that plaintiffs have not presented sufficient evidence to allow a reasonable trier of fact to calculate damages. The plaintiff has the burden of proving his damages by a preponderance of the evidence. *Alover Distributors, Inc. v. Kroger Co.*, 513 F.2d 1137, 1141 (7th Cir.1975). "Proof that damages have been suffered must be made 'by credible evidence to a reasonable certainty' and the amount of the damages must be proven 'at least to a reasonable probability.'" *Custom Automated Machinery v. Penda Corp.*, 537 F.Supp. 77, 85 n. 13 (N.D.Ill.1982) (citation omitted). The party seeking recovery must establish the nature and extent of damages with reasonable certainty. *DMI, Inc. v. Country Mutual Ins. Co.*, 82 Ill.App.3d 113, 115, 37 Ill.Dec. 803, 805, 402 N.E.2d 805, 807 (3d Dist.1980). The trier of fact may not base a judgment on speculation or guesswork, but must make a reasonable estimate of damage based upon the relevant data. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124, 89 S.Ct. 1562, 1577, 23 L.Ed. 2d 129 (1969). The evidence must also establish a reasonable basis for the jury to compute damages. *Beaton & Assoc., Ltd. v. Joslyn Mfg. & Supply Co.*, 159 Ill.App. 3d 834, 845, 111 Ill.Dec. 649, 655, 512 N.E. 2d 1286, 1292 (1st Dist.1987).

Plaintiffs contend that this Court is bound by a different standard. They argue that once a plaintiff establishes the *fact* of damage, the trial court is compelled to allow the trier of fact to estimate the *extent* of that damage. The cases relied upon by plaintiffs involve situations where courts tolerate a level of speculation in plaintiffs' proof for either of two reasons, neither of which applies here. One type of case involves theoretical damages for money a plaintiff would have realized had it not been for the defendant's tortious conduct. The second situation concerns a defendant whose conduct actually interfered with the

plaintiff's ability to prove his damages more precisely.

In *Independence Tube Corp. v. Copperweld Corp.*, 691 F.2d 310 (7th Cir.1982) *rev'd on other grounds*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), and *Hannigan v. Sears, Roebuck and Co.*, 410 F.2d 285 (7th Cir.1969), *cert. denied*, 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 178 (1969), the plaintiffs sought damages for tortious inducement of breach of contract. Both cases involved damages for lost business profits. The dispute in *Independence Tube* concerned plaintiff's ability to prove lost business profits with respect to a business that had no profit history. The plaintiff's proof consisted of testimony of an expert who utilized economic analysis to extrapolate what the plaintiff's market share and resulting profits would have been in the steel tubing industry had it not been for the defendant's conduct. *Independence Tube*, 691 F.2d at 330. Although the court found that the plaintiff had established a reasonable basis for the trier of fact to compute damages, the language of the opinion indicates that the holding is limited to cases involving lost profits:

> Where lost profits are sought to be recovered as damages, the recovery is to be based upon the net profit. Net profits are determined by computing the difference between the gross profits and the expenses that would be incurred in acquiring such profits. While these damages may not be speculative, they need not be proved to a mathematical certainty.

*Id.* at 328. The *Independence Tube* court relied on an Illinois Supreme Court case for the proposition that "absolute certainty as to the amount of loss or damage *in such cases* is unattainable.... All the law requires *in cases of this character* is that the evidence shall with a fair degree of probability tend to establish a basis for the assessment of damages." *Id.* at 328, quoting *Barnett v. Caldwell Furniture Co.*, 277 Ill. 286, 289, 115 N.E. 389 (1917) (emphasis added). Similarly, in *Hannigan*, 410 F.2d 285 (7th Cir.1969), *cert. denied*, 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 178 (1969), the plaintiff sought damages for lost profits.

The Seventh Circuit held that damages *for lost profits* must be based on net profits or a reasonable approximation thereof. *Hannigan*, 410 F.2d 285, 293 (emphasis added). Thus, both *Independence Tube* and *Hannigan* concern theoretical losses where proof of damage may only be accomplished through extrapolation of past events. In cases of this type, courts necessarily allow a degree of speculation on the part of the trier of fact.

Plaintiffs also rely on *Bailey v. Meister Brau, Inc.*, 535 F.2d 982 (7th Cir.1976), which involved the valuation of bonuses the plaintiff would have received had it not been for the defendant's conduct. The plaintiff alleged, *inter alia*, that defendant tortiously interfered with the plaintiff's right of first refusal in the purchase of his stock. *Id.* at 986. The plaintiff's damages proof consisted of projections of the operations of the company over a six-year period. Again, the Seventh Circuit upheld the damage award because in that particular situation the projections represented a reasonable estimate of the plaintiff's theoretical loss based on the relevant evidence. *Id.* at 991.

In *Eureka Investment Corp., N.V. v. Chicago Title Ins. Co.*, 743 F.2d 932 (D.C. Cir.1984), the plaintiff sued its title insurer for, *inter alia*, delay in beginning sales of condominiums after a tenant's lawsuit delayed conversion of plaintiff's building into condominiums. As to damages resulting from the delay, the plaintiff presented proof of the actual sales of the condominiums. The court found that the plaintiff proved the fact of this loss to a sufficient degree of certainty because it was reasonable to assume that the plaintiff would have made the same sales one month earlier, had it not been for the defendant's conduct. *Id.* at 939. The court allowed this assumption only because "[the plaintiff] did not—and obviously could not—demonstrate particular lost sales." *Id.*

Thus, like *Independence Tube, Hannigan* and *Bailey*, the *Eureka* decision applies to a case which concerns money that the plaintiff *would* have realized but for the defendant's conduct. In such cases,

plaintiffs may only accomplish proof of damages through extrapolation, which necessarily involves a degree of speculation. The instant case, in contrast, involves physical damage. Because the plaintiffs are not burdened by the difficulty of proving an event which might have occurred, they are not justified in speculating about their loss. Therefore, the law requires a higher degree of proof concerning the extent of the damage.

Finally, plaintiffs rely on *U.S. Castings Co. v. Knight*, 754 F.2d 1363 (7th Cir.1985), in arguing that the Court must allow the jury to estimate their damages. In *Castings*, the purchaser of all of the stock of a closely held company brought fraud and breach of contract claims against the seller. *Id.* at 1365. The trial court awarded the plaintiff $1.3 million in damages, representing the difference between the "fair value" of the stock and the purchase price paid by the plaintiff. *Id.* The plaintiff alleged that the actual value of the company was substantially less than the price plaintiff paid, due to the defendant's partially falsified financial records. *Id.* at 1367. The plaintiff's proof consisted of expert testimony which indicated that actual earnings for the period in question were less than reported because defendant included earnings received in subsequent periods. *Id.* at 1367-68. The Seventh Circuit found that it was virtually impossible to determine exactly which revenues were falsely reported, and it upheld the jury verdict based on plaintiff's expert's adjustment. *Id.* at 1371, 1373. The court stressed the fact that the defendant's conduct in backdating invoices and revenues "caused the difficulty in ascertaining the precise extent of actual damages." *Id.* at 1374. The court found that the defendant could not object to the lack of precision in quantifying damages when its own conduct contributed to such imprecision. *Id.*

The *U.S. Castings* standard does not apply where, as here, defendant did not contribute to plaintiffs' inability to precisely ascertain their damages. Plaintiffs have the burden of separating losses for which they can recover from those for which they cannot recover. *Sager Glove Corp. v. Aet-* *na Ins. Co.*, 317 F.2d 439 (7th Cir.1963), *cert. denied*, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963) (citing *Springfield M.C. Fire Ins. Co. v. Merriman*, 134 Ill.App. 249, 251 (1907). Plaintiffs' experts admitted that an air pressure test was the only available method by which they could locate further pipe damage in the System. (Alwin first affidavit at 3–4; Reisner deposition at 27–28, 105.) Furthermore, plaintiffs could not complete this test without first replacing 828 isolation valves within the System. (Wallace letter to Reisner, dated March 5, 1984.) Plaintiffs elected not to replace those valves. Instead, they sought an alternative method to provide heat to the building. Thus, plaintiffs' inability to quantify the extent of their damages was a result of their own conduct, not that of the defendant.

Thus, neither of the exceptions relied on by plaintiffs apply here. Rather, plaintiffs are required to present physical evidence which tends to establish their loss to a reasonable degree of certainty, and in such form as to provide the trier of fact with a reasonable basis to compute an award. *See Hoefferle Truck Sales v. Divco–Wayne Corp.*, 523 F.2d 543, 553 (7th Cir.1975); *see also, Gannon v. Freeman*, 103 Ill.App.3d 917, 919, 59 Ill.Dec. 546, 548, 431 N.E.2d 1303, 1305 (1st Dist.1982) ("Where damages are susceptible of precise proof, direct and tangible evidence must be offered."). With this standard in mind, the Court will proceed to assess plaintiffs' evidence.

Plaintiffs' expert, Alwin, claimed that the cost of repairing the remaining damage to the System "will be at least as much as the work already performed which came to a total of $75,712.16. The cost would be far greater, depending on the extent of the damage." (Alwin first affidavit at 4–5). As to the basis for his conclusion, Alwin stated "[f]rom my experience and observation of the damage which was repaired, I believe that if the [System] could have been pressure tested we would have identified at least as many additional leaks as were repaired." (Alwin second affidavit at 2.) Plaintiffs' other expert, Reisner, was of the opinion that the cost of repairing the re-

maining damage "would have been in the range of hundreds of thousands of dollars." (Reisner deposition at 88–89.) Reisner based his estimate on past damage; he "look[ed] at the costs that we had incurred so far, and [took] into account we only attacked one tier of the building...." (Reisner deposition at 88.) However, the past damage involved a very small portion of the System in the Building.[12] Plaintiffs do not argue, and the Court does not conclude, that such a small portion of the System is representative of the entire System.

Thus, plaintiffs attempt to prove the extent of their damage by extrapolating from the cost to repair past damage which is not the subject of this dispute. Although for purposes of this motion, defendant assumes the existence of further damage, the Seventh Circuit has specifically held that the admitted fact of damage does not suffice to establish the amount of damages. *Hoefferle Truck Sales, Inc. v. Divco–Wayne Corp.*, 523 F.2d 543, 553 (7th Cir. 1975). Moreover, both experts couched their estimates in qualifying language.[13] In exposing the speculative and hypothetical nature of their estimates, the experts ironically highlight the logic behind the policy of requiring physical evidence to establish a physical loss. It is undisputed that plaintiffs' experts failed to locate additional damage to the pipes when plaintiffs elected not to pressure test the System. Without locating the damage, the expert opinions are mere speculation; therefore, their cost estimates prove nothing. *Looby v. Buck*, 20 Ill.App.2d 156, 161, 155 N.E.2d 641, 644 (2d Dist.1959). In *Looby*, the plaintiff attempted to recover the cost of repairing drainage ditches. The only evidence as to the amount of damage was the plaintiff's testimony that a third party told him "that it would cost about $300 to clean the ditches and *if* the tile had to be taken up it would be about $1,875 additional...." *Id.* 155 N.E.2d at 644 (emphasis in original). In reversing a $2,175 award for the plaintiff, the appellate court found the damages proof insufficient for several reasons. Because the record contained no evidence that the third party inspected the drainage ditches, he lacked knowledge of the damage. Additionally, the evidence failed to indicate that the plaintiff actually completed the repairs or that such repairs were even necessary. *Id.* The court concluded that the plaintiff's damages evidence consisted merely of "speculation, hypothesis, conjecture or whim." *See Id.* at 645.

Similarly, in the case at bar, plaintiff's experts lacked any personal knowledge of further pipe damage. Furthermore, plaintiffs' failure to locate further damage rendered repair impossible and left the record void of any competent evidence that repair was even necessary. In light of plaintiffs' failure to produce any physical evidence to support their estimate of damage, the Court holds, as a matter of law, that they fail to establish a loss to a reasonable degree of certainty. Consequently, a trier of fact has no basis to compute damages.

---

**12.** The damage that defendant previously paid plaintiffs to repair was found only on the north side of the Building. (Reisner deposition at 41, 88.) In addition, although the System served all 278 of the units in the Building, the plaintiffs located damage in only twenty-three of those units.

**13.** Alwin testified, *"if* the [System] could have been pressure tested we would have identified at least as many additional leaks as were repaired." (Alwin second affidavit at 2) (emphasis added). Furthermore, when asked if he was ever called upon to estimate the damage to a pipe system that he could not test, Alwin replied, "we were never pushed into a corner to give ... and would not allow ... ourselves to be pushed to give a firm price estimate of a repair cost on a system that we couldn't quantify the

costs on. These types of systems you can't without testing." (Alwin deposition at 105.)

Reisner not only qualified his estimate to a greater extent than Alwin, he actually questioned the credibility of Alwin's conclusion. When first asked for an estimate, Reisner stated, "[i]t's very, very hard to predict ... [b]ecause in my judgment, we didn't have a chance to get a good handle on how extensive the damage really was ... we really attacked a very small section of the building." (Reisner deposition at 87.) After estimating that the remaining repairs would cost "hundreds of thousands of dollars," when asked if he could be more specific, Reisner replied, "[n]o way. I'm aware that Jim Alwin had some estimates at the time, but I don't think it had any basis. We just don't know." (Reisner deposition at 89.)

**1322**

Plaintiffs thus have not presented a disputed issue of fact with respect to the amount of damages, and defendant is entitled to summary judgment as a matter of law.

### IV. CONCLUSION

At trial, plaintiffs have the burden of establishing that a fortuitous event caused damage to their property. Without locating further damage to the pipes within the System of their Building, plaintiffs fail to provide minimal evidence that such damage is attributable to a fortuitous event. In addition, plaintiffs' estimates as to the amount of any further damages involves unsupported speculation. For these alternative and independent reasons, the Court grants summary judgment in favor of defendant.