ADVANCE CABLE COMPANY, LLC, and Pinehurst Commercial Investments, LLC, Plaintiffs–Appellees, Cross–Appellants,

v.

CINCINNATI INSURANCE COMPANY, Defendant–Appellant, Cross–Appellee.

Nos. 14–2620, 14–2748.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 11, 2014.

Decided June 11, 2015.

Charles David Schmidt, Anthony K. Murdock, Attorney, Halloin & Murdock, S.C., Milwaukee, WI, for Plaintiffs–Appellees, Cross–Appellants.

Stephanie L. Dykeman, Mark W. Rattan, Attorney, Litchfield Cavo, Brookfield, WI, for Defendant–Appellant, Cross–Appellee.

Before WOOD, Chief Judge and
FLAUM and MANION, Circuit Judges.

WOOD, Chief Judge.

On April 3, 2011, Middleton, Wisconsin, was pelted with hail. Predictably, some structures were damaged, including the metal roof of a building located at 2113 Eagle Drive. The owners, Advance Cable Company and Pinehurst Commercial Investments (to which we refer collectively as Advance), submitted a claim to their insurance company, Cincinnati Insurance, but they were not satisfied with its response. Cincinnati took the position that the damage was cosmetic and thus excluded from the policy, while Advance thought the damage was more extensive and covered by the policy; indeed, Advance believed it was entitled to reimbursement for a new roof. It brought this diversity ac-

tion in federal court to resolve the matter. The district court granted summary judgment for Advance on the coverage question, but it rejected Advance's argument that Cincinnati acted in bad faith when it refused to pay for the new roof. We affirm.

## I

In 2010, Advance obtained an insurance policy from Cincinnati on two properties in Middleton, one of them at 2113 Eagle Drive. (Pinehurst entered the picture because it owned the building and was added to the policy as a named insured in 2011. Its presence has no effect on our analysis.) Only a few of the policy's provisions concern us. Under the heading "Coverage," the policy says, "We will pay for direct physical 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss." The policy defines "Covered Causes of Loss" as "risks of direct physical loss," and then defines "loss" as "accidental loss or damage." It does not define "direct" or "physical." The parties do not dispute that the "Covered Property" includes the building at 2113 Eagle Drive; that building is specifically listed in the "Schedule of Locations" in the policy.

After the hailstorm rolled through Middleton in April 2011, Mike Larson, Advance's president, filled out a form reporting damage to the Eagle Drive property and another building. That same month, Larson inspected the roof at 2113 Eagle Drive with Curt Jorgenson, a senior claims representative for Cincinnati. Jorgenson spotted some dents, but he saw little other evidence of damage. In June 2011, Jorgenson sent Larson an "estimate for hail damage to your building," in which he "note[d] some dents to soft metal roof vents and AC fins" but stated that he "did not observe any damage to roofing." Jorgenson estimated that the building required $1,894.74 in repairs. The next month, Jorgenson sent Larson a check representing the estimated damages to both of Advance's buildings, minus a $1,000 deductible, for a total of $1,512.70.

The story did not end there. Approximately six months later, in January 2012, Advance was considering selling the Eagle Drive building. The potential buyer, Welton Enterprises, decided to have the roof inspected. Unlike Jorgenson, Welton's inspector reported that there was "definitely hail damage." (Cincinnati disputed at summary judgment that the Welton inspector was referring to the Eagle Drive property, but the district court properly found no genuine dispute of fact on this question given the cover email's reference to "the Eagle Drive roof.") This opinion prompted Advance to ask Jorgenson to reopen Advance's claim. He did so and arranged for a new inspection of the roof. The resulting report covered both of Advance's buildings in Middleton. It noted that "[m]etal roof panel denting characteristic of hail impact was found on several buildings. Dents related to hail impact varied in size from barely discernable to approximately 1" in 1 [sic] diameter." Under the heading "Discussion," the report opined that the denting "will not affect the performance of the panels (roofs) or detract from the panels['] (roofs['] ) life expectancy.... The denting that occurred as a result of hail impact was relatively minor and cannot be view [sic] from ground level."

A few months after receiving this report, Advance sold the 2113 Eagle Drive building to Welton, without any further developments relating to its claim with Cincinnati for hail damage to the roof. Believing that Cincinnati had breached its contract with Advance to cover damage to the Eagle Drive building and that its denial of coverage was in bad faith, Advance sued Cincinnati in April 2013. Both Advance

and Cincinnati moved for summary judgment. Advance asked the district court to rule that the insurance policy covered the hail damage; Cincinnati asked the court to find that coverage was excluded and also to grant summary judgment against Advance on its bad faith claim. As we mentioned above, the district court held that the policy did cover the hail damage, but that Cincinnati's refusal to acknowledge this was not done in bad faith. Following the court's summary judgment decision, the parties stipulated that the sole issue remaining for trial was the amount of money necessary to replace the damaged roof. They then stipulated that this amount was $175,500, and the court entered a final judgment in that amount in favor of Advance.

## II

■ We review *de novo* a district court's decision to grant summary judgment. *Doe v. Archdiocese of Milwaukee*, 772 F.3d 437, 440 (7th Cir.2014). In reviewing cross-motions for summary judgment, we take the motions one at a time and then, as usual, construe all facts and draw all reasonable inferences in favor of the non-moving party. See *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir.2014). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

■ We turn first to Advance's claim that its policy with Cincinnati covered hail damage to the roof. The law of Wisconsin furnishes the applicable rule of decision. 28 U.S.C. § 1652. Wisconsin courts construe insurance policies in the same manner as they would any contract. *Strauss v. Chubb Indem. Ins. Co.*, 771 F.3d 1026, 1030 (7th Cir.2014). We must ascertain what a reasonable person in the position of the insured—here, Advance—would understand the policy to mean. *Blum v. 1st Auto & Cas. Ins. Co.*, 326 Wis.2d 729, 786 N.W.2d 78, 83 (2010). Ambiguous language (that is, language that is "susceptible to more than one *reasonable* interpretation") is to be construed against the insurer and in favor of the insured. *State Farm Mut. Auto. Ins. Co. v. Langridge*, 275 Wis.2d 35, 683 N.W.2d 75, 81 (2004) (internal quotation marks omitted).

■ The heart of the dispute between the parties concerns the meaning of the term "direct physical loss" in the policy. In the end, however, we find the coverage question to be fairly straightforward. Neither Advance nor Cincinnati disputes the meaning of the term "direct" in the policy. Although the policy does not elaborate on that word, common sense suggests that it is meant to exclude situations in which an intervening force plays some role in the damage. No such force was present here: to the extent the roof was damaged at all, everyone agrees that the hailstorm was the culprit.

■ The parties devote more discussion to the word "physical," which like "direct" is not defined in the policy. Cincinnati contends that "physical" for purposes of the policy means "material," although it unhelpfully does not suggest a definition of "material." We can think of several possibilities: it might be a synonym for "physical," as in "formed or consisting of matter"; or it might connote "pertinent," or "central," or "essential." Cincinnati advocates the latter meaning and supports its position with a single district court decision, *Crestview Country Club, Inc. v. St. Paul Guardian Ins. Co.*, 321 F.Supp.2d 260 (D.Mass.2004). We do not find *Crestview* to be especially helpful. It concerned whether an insurance policy covered damage from a severe wind storm to a golf

course. The storm destroyed a notable ash known as the "Poltergeist Tree," which loomed above the thirteenth hole. No one disputed that the policy covered replacement of the tree. But the plaintiff wanted more: it argued that the insurance company also had to pay for the redesign of the thirteenth hole, because the loss of the Poltergeist Tree had ineffably altered the hole's character, even though the hole itself was not damaged. The district court held that intangible changes to the hole's character did not count as "direct physical loss or damage to the golf course grounds" and thus did not trigger coverage of changes to the hole. *Id.* at 264. We fail to see the resemblance between *Crestview* and this case. Advance is not asking for coverage of intangible damage. Rather, it is claiming that hail caused visible indentations to the surface of its roof. This denting changes the physical characteristics of the roof and thus satisfies that language of the policy.

■ The next question is what the term "loss" means here. The policy (at last) offers an answer: it defines "loss" as "accidental loss or damage." The district court, in deciding that this concept encompasses all hail denting—both dents that diminish the functionality of the roof and dents that may be only cosmetic—emphasized the disjunctive nature of the definition. The policy covers loss *or* damage. This indicated to the district court that even without a measurable "loss" in value or in function, "the policy expressly contemplates the possibility that there may still be 'damage,' presumably giving it a different meaning than the word 'loss.'" This was a sensible conclusion, and Cincinnati has given us no reason to believe that inclusion of the phrase "or damage" in the definition of loss was superfluous. In fact, it has offered no explanation for the inclusion of both words, despite, we assume, having written the policy.

Instead, Cincinnati urges us to define "loss or damage" to mean "harm." It then makes the assumption that the dents caused by the hail did not harm the roof enough to diminish its function or value. No harm, no foul, it says: if this is the case, then it believes that the policy does not require it to pay to replace the roof. The problem with this analysis is that it bears no relation to the language of the policy. There is no exception to the definition of "loss" for cosmetic damage, or any other kind of particular damage. Had Cincinnati wished to exclude cosmetic damage from coverage, it should have written the policy that way. As Advance points out, Cincinnati contemplated instituting just such an exclusion in other policies after the events of this case. Even if it is unclear whether the policy intended "loss" to be limited to harm from diminution of value or functionality, Wisconsin law requires us to construe the language in favor of Advance, not Cincinnati. The district court cases on which Cincinnati relies are either distinguishable or unpersuasive.

The last argument that warrants discussion relates to the concept of economic waste. Cincinnati contends that it should not have to pay for an entirely new roof for Advance simply because the roof sustained denting. In making this argument, Cincinnati is attempting to board a ship that has already sailed. The issue before us is not damages; it is coverage. As Cincinnati acknowledges, economic waste is a damages concept. So it is cause for head-scratching when Cincinnati argues, without much further explanation, that "the economic waste doctrine provides support for the conclusion that cosmetic denting does not constitute 'direct physical loss.'" Perhaps this is simply a variation on Cincinnati's argument that damage must be substantial or "structural" in order to qualify as "physical," but that is not what the policy says. The policy requires

Cincinnati to compensate Advance for "direct physical loss" to its Eagle Drive building, and it defines "loss" as "loss or damage"; the hail, in denting the building's rooftop, physically and directly damaged it. Thus the district court's decision to grant Advance summary judgment on this question was correct.

Cincinnati finally argues that if we were to reverse the district court's grant of summary judgment to Advance on its breach of contract claim, we should also find that Advance breached its duty of good faith and fair dealing in delaying its disclosure of an expert report about injury to the Eagle Drive rooftop. Because we affirm the district court's grant of summary judgment to Advance on the issue of coverage, we need not reach this argument.

### III

■ We now turn to Advance's cross-appeal, in which it argues that the district court erred by granting summary judgment in Cincinnati's favor on its claim that Cincinnati's decision to deny coverage for the hail denting was undertaken in bad faith. The court found that the undisputed material facts showed that it was reasonable, even if incorrect, for Cincinnati to refuse to pay Advance's claim because it did not believe Advance suffered "loss or damage" from the hail damage.

■ The courts of Wisconsin permit insured parties to bring bad faith claims against their insurance providers. A plaintiff bringing such a claim must show two things: " 'the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.' " *Brethorst v. Allstate Prop. & Cas. Ins. Co.*, 334 Wis.2d 23, 798 N.W.2d 467, 474 (2011) (quoting *Anderson v. Cont'l Ins. Co.*, 85 Wis.2d 675, 271 N.W.2d 368, 376 (.1978)). The Supreme Court of Wisconsin has characterized the first of these elements as objective, and the second as subjective. *Weiss v. United Fire & Cas. Co.*, 197 Wis.2d 365, 541 N.W.2d 753, 757 (1995). The objective element tests "whether the insurer properly investigated the claim and whether the results of the investigation were subject to a reasonable evaluation and review." *Brown v. Labor & Indus. Review Comm'n*, 267 Wis.2d 31, 671 N.W.2d 279, 287–88 (2003). The subjective element asks whether the insurer was aware that there was no reasonable basis for denial, or that it displayed "reckless disregard of a lack of a reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured." *Anderson*, 271 N.W.2d at 377.

We take it as a given that the policy at issue required coverage of hail damage to Advance's roof. But that does not mean Cincinnati's investigation and subsequent evaluation that coverage was lacking were unreasonable. Cincinnati's reading of the policy, while wrong, was not beyond the pale; we already have noted that there are several plausible readings of, for example, the term "physical," and that Cincinnati was able to find federal cases that provided some support for its position. Advance's argument amounts to a proposed rule that would require a finding of bad faith any time an insurer does not prevail in its reading of a policy. This strikes us as draconian. It is also worth noting that Cincinnati worked with Advance on the claim for a time, making multiple visits to the Eagle Drive property to inspect the roof and extending an offer of compensation, albeit one that was far lower than Advance believed was proper.

Advance nonetheless argues that Cincinnati should have known its position contradicted that of the American Association of Insurance Services (AAIS), which made its

thoughts on cosmetic damage known in a 2013 article in *Viewpoint* magazine, an AAIS publication. There, Advance contends, AAIS noted that its standard property insurance forms do not distinguish between "physical damage that affects only the property's appearance" and damage affecting the property's function. But Advance does not contend that Cincinnati knew of these forms or this article, let alone used them or understood them to be an industry standard. Advance also points to Cincinnati's 2013 filing with the Wisconsin insurance commissioner. In that filing, it sought approval of "a new optional endorsement" permitting it to exclude cosmetic damage from its policies. Advance sees in this filing an implicit acknowledgment from Cincinnati that its position that cosmetic damage was excluded from its coverage was "baseless" back in 2011 and 2012, when the events of this case occurred. This is pure speculation. A 2013 filing says nothing about what Cincinnati knew or did not know in 2011. Regardless, even if the filing had occurred in 2011, it would fail to show that Cincinnati's contrary position in the current case is not reasonable or that Cincinnati was reckless in denying coverage here. Sometimes policies are amended for purposes of clarification; sometimes for purposes of change. The district court was correct not to place any weight on this after-the-fact development.

As for Cincinnati's investigation, Advance contended at oral argument that there is no evidence Cincinnati looked at Advance's policy before denying coverage—that it failed to "show its work," to use Advance's phrase. Advance observes that Cincinnati at one point retained an attorney, but not to analyze coverage. Advance believes that this suggests that Cincinnati was anticipating litigation over its predetermined denial of coverage. This argument is also speculative and does not "suggest" one thing or another about whether Cincinnati intended to deny coverage before evaluating Advance's claim. Companies are permitted to hire attorneys to assess their legal positions without being suspected of bad faith. Advance's argument would require us to hunt for a sharper line of demarcation between an insurance company's various stages of legal analysis than we have any business drawing. In any event, the evidence in the record is inconsistent with these musings: Cincinnati twice investigated the rooftop, calculated an estimate for coverage, reopened the claim when Advance asked it to, and has relied on cases in support of its arguments. Advance's argument that Cincinnati should have "shown its work," right down to revealing the dictionary definitions the company reviewed internally when evaluating coverage, goes well beyond anything that the law requires to defeat an allegation of bad faith.

## IV

The insurance policy that Cincinnati sold to Advance covered any direct physical loss or damage to Advance's Eagle Drive property in Middleton, Wisconsin. We agree with the district court that, as applied here, the policy covered the hail damage Advance's building suffered in April 2011. We therefore AFFIRM the district court's decision granting Advance's motion for partial summary judgment on the reach of the insurance policy. We also agree with the district court's decision to grant Cincinnati summary judgment on Advance's bad faith claim, and AFFIRM that decision as well.