In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-2103

WINDRIDGE OF NAPERVILLE
CONDOMINIUM ASSOCIATION,

*Plaintiff-Appellee,*

*v.*

PHILADELPHIA INDEMNITY INSURANCE
COMPANY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-CV-3860 — **Gary Feinerman**, *Judge.*

ARGUED MARCH 27, 2019 — DECIDED AUGUST 7, 2019

Before EASTERBROOK, KANNE, and HAMILTON, *Circuit
Judges.*

HAMILTON, *Circuit Judge.* This appeal presents an insurance coverage dispute between Windridge of Naperville Condominium Association and Philadelphia Indemnity Insurance Company. On May 20, 2014, a hail and wind storm damaged buildings owned by Windridge. The buildings were

insured by Philadelphia Indemnity. The storm physically damaged the aluminum siding on the buildings' south and west sides. Philadelphia Indemnity contends that it is required under the insurance policy to replace the siding only on those sides. Windridge argues that replacement siding that matches the undamaged north and east elevations is no longer available, so Philadelphia Indemnity must replace the siding on all four sides of the buildings so that all of the siding matches. The district court granted summary judgment to Windridge on that coverage issue. We affirm.

I.   *Factual & Procedural Background*

We review the factual record in the light reasonably most favorable to Philadelphia Indemnity as the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Yahnke v. Kane County*, 823 F.3d 1066, 1070 (7th Cir. 2016). For starters, the parties agree that the insurance policy was in effect on May 20, 2014, when the hail and wind storm damaged Windridge's buildings. They also agree that the storm directly damaged the siding only on the buildings' south and west sides. Philadelphia Indemnity has already paid $2.1 million to Windridge for that damage. Windridge seeks additional money to replace the siding on the north and east sides because matching siding is no longer available for purchase. Windridge argues it is entitled under the policy to have the buildings repaired so that, as before the storm, the siding matches on all sides. Philadelphia Indemnity has refused to pay for these additional costs and argues that the policy requires payment only to replace siding that was directly hit and damaged by the hail and wind.

A. *The Insurance Policy*

We start with the text of the insurance policy. Under the coverage provision, Philadelphia Indemnity must "pay for direct physical 'loss' to Covered Property caused by or resulting from any of the Covered Causes of Loss." "Covered Property … means," among other things, the "'Buildings' described in the Declarations." "'Buildings' means buildings or structures." "'Loss' means accidental loss or damage." The policy's loss valuation provision provides:

7. Valuation

We will determine the value of Covered Property in the event of "loss" as follows:

a. At replacement cost (without deduction for depreciation) as of the time of "loss" …

(1) We will not pay more for "loss" on a replacement costs basis than the least of:

(a) The Limit of Insurance applicable to the lost or damaged property;

(b) The cost to replace the lost or damaged property with other property:

(i) Of comparable material and quality; and

(ii) Used for the same purpose; or

(c) The amount you actually spend that is necessary to repair or replace the lost of damaged property.

The policy's loss payment provision provides:

> 4. Loss Payment
>
>> a. In the event of "loss" to Covered Property covered by this Coverage form, at our option, we will either:
>>
>>> (1) Pay the value of lost or damaged property;
>>>
>>> (2) Pay the cost of repairing or replacing the lost or damaged property;
>>>
>>> (3) Take all or any part of the property at an agreed or appraised value; or
>>>
>>> (4) Repair, rebuild or replace the property with other property of like kind and quality.

B.  *District Court & Appraisal Proceedings*

After the storm, Windridge submitted a claim to Philadelphia Indemnity, which paid $2.1 million for losses it conceded were covered by the policy. Windridge brought this suit under diversity jurisdiction alleging that the insurance policy entitled it to an independent appraisal to value the storm damage. Windridge's operative Second Amended Complaint asserts a claim for breach of contract for Philadelphia Indemnity's failure to make full payment for the covered loss. The complaint also seeks declaratory relief.

Windridge filed a motion to compel an appraisal, which the district court granted in part and denied in part. The policy's appraisal provision states:

> If we and you disagree on the value of the property or the amount of "loss", either may make written demand for an appraisal of the "loss". In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

The court ordered Philadelphia Indemnity to proceed to appraisal as to the damage indisputably covered by the policy, but not as to the claimed damage over which there was a genuine coverage dispute. *Windridge of Naperville Condo. Ass'n v. Philadelphia Indemnity Insurance Co.*, 2017 WL 372308, at *4 (N.D. Ill. Jan. 26, 2017).

Windridge moved for summary judgment on its declaratory judgment claim, arguing that matching siding is not available anymore and that, as a result, Philadelphia Indemnity must pay to replace the siding on all four sides of the buildings. The district court ruled that it could not grant summary judgment to Windridge on the factual question underlying the dispute (whether matching siding is available on the market). *Windridge of Naperville Condo. Ass'n v. Philadelphia Indemnity Insurance Co.*, 2018 WL 1784140, at *2 (N.D. Ill. Apr. 13, 2018). The court explained:

> Windridge submits evidence that matching siding has been discontinued and that no match

exists. Doc. 71 at ¶¶ 14-17. [Philadelphia Indem-
nity] responds with evidence that a match does
exist. Doc. 74 at ¶¶ 14-17; Doc. 77 at ¶¶ 7-12. The
conflicting evidence gives rise to a genuine dis-
pute about a material fact that precludes the
court from holding on summary judgment that
no match presently exists.

*Id.* The court therefore ruled that this question should be sub-
mitted to appraisal. *Id.* at *5. The court gave Philadelphia In-
demnity until May 4, 2018 to name an appraiser, and if it did
not do so, the court explained that Windridge could move the
court to appoint an appraiser. *Id.*[1]

The court then assumed that no matching siding is availa-
ble and answered the legal question: whether the policy re-
quires Philadelphia Indemnity to replace or pay to replace the

---

[1] At oral argument, neither party's counsel could tell us what had hap-
pened in the appraisal ordered by the district court to determine whether
or not matching siding is available. Supplemental briefing has not done
much to clarify the issue. The parties seem to agree that no appraisal has
taken place following the district court's summary judgment opinion.
Windridge contends that the first appraisal already determined that no
matching siding is available. Clearly the district court did not think that
was the case, as the court specifically ordered this question to be answered
in a second appraisal. Regardless, Philadelphia Indemnity conceded at
oral argument that "there is no longer matching siding available." It also
appears that Philadelphia Indemnity conceded in the district court that its
own construction consultant determined that matching siding was avail-
able only "until October 2015." Philadelphia Indemnity's contention that
matching siding was available was the only reason there was a factual dis-
pute to submit to appraisal following the summary judgment ruling. Since
Philadelphia Indemnity seems to have abandoned this contention, we
conclude that there is no dispute here, and the parties agree matching sid-
ing is not available.

siding on all four elevations (to ensure matching) or only on the physically damaged elevations. 2018 WL 1784140 at *2–*3. The court determined that matching is required. *Id.* at *4. It explained that, while Philadelphia Indemnity's argument was "attractive at first glance," it "rests on the premise that the phrase 'Covered Property' refers to the building on an elevation-by elevation basis as opposed to the building as a unified whole." *Id.* at *3. The court concluded that "the only sensible result is to treat the damage as having occurred to the building's siding as a whole":

> If [Philadelphia Indemnity] were to replace the siding on the damaged south and west elevations with siding that did not match that on the undamaged north and east elevations, it could not possibly be said that Windridge had been made whole, for it would be left with a building suffering from a glaring and profound flaw.

*Id.* at *4. Alternatively, the court held that the policy terms are ambiguous, and, under Illinois law, the contract must be construed in favor of coverage. *Id.* Philadelphia Indemnity has appealed.[2]

---

[2] The district court's decision was sufficiently final for appellate jurisdiction. See *American Int'l Specialty Lines Insurance Co. v. Electronic Data Systems Corp.*, 347 F.3d 665, 668 (7th Cir. 2003) ("an order that terminates proceedings in the district court is final and appealable, whatever it is called"), citing *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 89 (2000). The district court issued a docket entry on April 13, 2018 that serves as a final judgment declaring the parties' rights and saying the case was closed. Philadelphia Indemnity could not wait for any further order before appealing.

II. *Discussion*

We review *de novo* the district court's summary judgment ruling. *Advance Cable Co., LLC v. Cincinnati Insurance Co.*, 788 F.3d 743, 746 (7th Cir. 2015). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"The interpretation of an insurance policy is a matter of state law." *Westfield Insurance Co. v. Vandenberg*, 796 F.3d 773, 777 (7th Cir. 2015). Here, Illinois law controls, so we look to the decisions of the Illinois Supreme Court for guidance. *Id.* The Illinois Supreme Court has explained:

> An insurance policy is a contract, and the general rules governing the interpretation of other types of contracts also govern the interpretation of insurance policies. Accordingly, our primary objective is to ascertain and give effect to the intention of the parties, as expressed in the policy language. If the policy language is unambiguous, the policy will be applied as written, unless it contravenes public policy. Whether an ambiguity exists turns on whether the policy language is subject to more than one reasonable interpretation. Although "creative possibilities" may be suggested, only reasonable interpretations will be considered.

*Hobbs v. Hartford Insurance Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005) (internal citations omitted). Further, "to ascertain the meaning of the policy's language and the parties' intent, the court must construe the policy as a whole and 'take

into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract.'" *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 757 N.E.2d 481, 491 (Ill. 2001), quoting *American States Insurance Co. v. Koloms*, 687 N.E.2d 72, 75 (Ill. 1997).

The policy here is a replacement-cost policy. See *FSC Paper Corp. v. Sun Insurance Co. of New York*, 744 F.2d 1279, 1283 (7th Cir. 1984) (Illinois law) ("a replacement cost policy, by definition, provides a 'make-whole' remedy" that "must strive to approximate the situation [the insured] would have occupied had the fire not occurred"). In the policy here, Philadelphia Indemnity promised to "pay for direct physical 'loss' to Covered Property caused by or resulting from" the storm, with the amount of loss being "[t]he cost to replace the lost or damaged property with other property … [o]f comparable material and quality … and … [u]sed for the same purpose[.]" The loss payment provision offers four different measures for loss, leaving Philadelphia Indemnity free to choose the least expensive: pay the value of lost or damaged property; pay the cost of repairing or replacing the lost or damaged property; take all or any part of the property at an agreed or appraised value; or repair, rebuild or replace the property with other property of like kind and quality.[3]

---

[3] While only this fourth option includes the phrase "of like kind and quality," the valuation provision applies to all four choices—meaning that, regardless of which option Philadelphia Indemnity chooses, replacement property must be "[o]f comparable material and quality." Philadelphia Indemnity has chosen option two: "Pay the cost of repairing or replacing the lost or damaged property." Accordingly, it must pay the cost of replacing the damaged property with property that is comparable in its material and quality.

As we see it, two phrases in the coverage provision of the policy are potentially ambiguous as applied to the facts here: (1) "direct physical loss" and (2) "covered property." These phrases have definitions in the policy. "Loss" is defined as "accidental loss or damage." "Covered property" is defined to include, among other things, Windridge's "buildings." Neither definition in the policy answers the question we face here. The district court's conclusion that the buildings as a whole were damaged—and that all of the siding must be replaced to ensure matching—is a sensible construction of the policy language as applied to these facts. Philadelphia Indemnity's interpretation—pay to replace only the specific panels of siding that were directly hit by hail, leading to two-tone buildings—is less reasonable. Regardless, the unit of covered property to consider under the policy (each panel of siding vs. each side vs. the buildings as a whole) is ambiguous as applied to these facts, so under Illinois law, we favor the interpretation that leads to coverage. See *West American Insurance Co. v. Yorkville Nat. Bank*, 939 N.E.2d 288, 293 (Ill. 2010); *State Auto Prop. & Cas. Insurance Co. v. Brumit Services, Inc.*, 877 F.3d 355, 357 (7th Cir. 2017).

Courts around the country have confronted similar so-called "matching" issues. The results have been mixed, as the district court noted. While several opinions are instructive, this case is governed by the language in the Windridge policy with Philadelphia Indemnity. However, the coverage, valuation, and loss payment provisions of the policy here are nearly identical to those at issue in *National Presbyterian Church, Inc. v. GuideOne Mut. Insurance Co.*, 82 F. Supp. 3d 55, 57–58 (D.D.C. 2015) (applying District of Columbia law). The factual dispute was also nearly identical. Some, but not all, of a church's exterior limestone panels were damaged in an

earthquake. *Id.* at 56. The question was whether the property insurer was required under the policy to replace all of the limestone panels to ensure matching or just the panels that were directly damaged. *Id.*

Judge Bates' analysis of the issue is persuasive. He explained that "the crux of the issue seems to be whether *this* policy's coverage of damaged property refers to the smallest unit possible (an individual panel, a single shingle, a specific patch of flooring) or to one larger (the entire façade, the whole roof, a continuous stretch of flooring)." *Id.* at 59. The court determined that the policy was ambiguous as applied to the damage to specific portions of the building, at least where repairs to only those portions would leave aesthetic matching issues, so the court found in favor of the insured, holding that matching was required and all of the limestone panels needed to be replaced. *Id.* at 60.

We face essentially the same issue under the same language and arrive at the same result. Put simply, Philadelphia Indemnity is required to replace or pay to replace covered property that suffered a "direct physical loss"—i.e., property that has been damaged. "Covered property" could be interpreted to mean each panel of siding, or to mean the entire damaged sides of buildings, or the entire damaged buildings. As for "direct physical loss," Philadelphia Indemnity makes much of the words "direct" and "physical," but we have previously explained that "common sense suggests" the term "direct" is meant to exclude situations in which an intervening force plays some role in the damage. *Advance Cable Co., LLC v. Cincinnati Insurance Co.*, 788 F.3d 743, 746 (7th Cir. 2015) (Wisconsin law). We have also explained that "physical"

generally refers to tangible as opposed to intangible damage. *Id.* at 746–47.[4]

Thus, while Philadelphia Indemnity's position that only the siding directly hit by the storm is covered is not indefensible and has some support in case law, the language of the policy is not so clear and in fact favors an interpretation that the unit of damaged property is the buildings as a whole—not solely each elevation or each panel of siding. As illustrated during oral argument, many hypotheticals caution against Philadelphia Indemnity's interpretation. Suppose the storm damaged every other piece of siding on only the east elevations of the buildings. Or suppose a storm damaged only the middle three feet of every piece of siding on the buildings. Philadelphia Indemnity would have us view the unit of damaged property as an individual side of a building, or individual panels of siding, or even mere sections of individual panels of siding. An interpretation of the policy that left Windridge with a horizontal or vertical striped effect on its buildings would not be reasonable. The better construction,

---

[4] An alteration in appearance constitutes physical, tangible damage. The Illinois Supreme Court has explained that "the term 'physical injury' unambiguously connotes damage to tangible property causing an alteration in appearance, shape, color or in other material dimension." *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 757 N.E.2d 481, 502 (Ill. 2001). Similarly, we have acknowledged that "[t]he central meaning of the term [physical injury] as it is used in everyday English—the image it would conjure up in the mind of a person unschooled in the subtleties of insurance law—is of a harmful change in appearance, shape, composition, or some other physical dimension of the 'injured' person or thing." *Eljer Manufacturing, Inc. v. Liberty Mut. Insurance Co.*, 972 F.2d 805, 808–09 (7th Cir. 1992) (Illinois law). In applying Wisconsin law, we have also explained that cosmetic damage to a roof caused by a hail storm was a covered "direct physical loss" to the property. *Advance Cable Co.*, 788 F.3d at 746–47.

and one certainly permitted by policy language that is ambiguous as applied to these facts, is that each building as a whole suffered direct physical loss as a result of the storm. The storm altered the appearance of the buildings such that they were damaged. Condominium buildings with mismatched siding are not a post-storm outcome that the insured was required to accept under this replacement-cost policy. As Judge Bates reasoned in *National Presbyterian Church*:

> Imagine that an insurance company pays for repairs to one wall of an insured's dining room. The room's paint color—a light blue—is no longer manufactured. If the insurance company were to insist on a bright red or even dark blue paint—of the same quality and manufacture— just for that single wall, no one would feel that the insured had been made whole; only repainting the whole room would do that.

82 F. Supp. 3d at 60.[5]

Philadelphia Indemnity points out that it does not control what siding is available on the market, and specifically whether a siding company continues to manufacture a particular color of siding. This is a risk Philadelphia Indemnity took

---

[5] We are also persuaded by *Trout Brook South Condo. Ass'n v. Harleysville Worcester Insurance Co.*, 995 F. Supp. 2d 1035 (D. Minn. 2014) (Minnesota law). There, the policy covered "direct physical loss" to "covered property," and the definition of "covered property" "indicate[d] coverage extends to '*buildings and structures*.'" *Id.* at 1042. The court held that "the Policy suggests that 'covered property' is each of Trout Brook's *buildings*, and not individual items (such as shingles or siding) attached or appurtenant to them. And it is undisputed that each *building* sustained 'direct physical loss' from the 2010 hail storm." *Id.*

on under the policy. Windridge has no more control of the siding marketplace than Philadelphia Indemnity does. Philadelphia Indemnity seeks to leave Windridge with buildings that have two sides in one color and two sides in another. Just as with the dining-room hypothetical, Windridge has not yet been made whole. It has not been returned to its pre-storm status. Philadelphia Indemnity chose to insure Windridge's "buildings," which—because of the storm—were all damaged. Due to the extent of the damage and the lack of matching siding available on the market, the better construction of this ambiguous policy is that it requires Philadelphia Indemnity to replace the siding on all four elevations of the buildings.[6]

Philadelphia Indemnity cites several "matching" cases that it thinks should lead us to favor its position. See, e.g., *Mohr v. American Auto. Insurance Co.*, 2004 WL 533475, at *10–*15 (N.D. Ill. Mar. 5, 2004) (court concluded that different policy language did not require "aesthetic perfection," and that, after bench trial, the insured failed to prove that replacing entire roof was necessary); *Woods Apartments, LLC v. United States Fire Insurance Co.*, 2013 WL 3929706, at *2 (W.D. Ky. July 29, 2013) (hurricane damaged parts of siding and roof on plaintiffs' apartment buildings; court found that, without

---

[6] Philadelphia Indemnity contends that matching siding was available after the storm for almost a year and a half and that Windridge is to blame for not acting sooner to replace the siding. Philadelphia Indemnity also cites § 7(a)(2) of the policy, which provides that it is not obliged to pay on a replacement-cost basis until the property is actually repaired or replaced and that the repair or replacement must occur "as soon as reasonably possible." The district court found that Windridge provided timely notice of the loss, and we agree. And in the face of the parties' dispute, Windridge was not required to spend money that might or might not be covered.

evidence that comparable material was unavailable, the policy unambiguously required the insurer to repair or replace only those portions of the property damaged by the hurricane); *Ocean View Towers Ass'n, Inc. v. QBE Insurance Corp.*, 2011 WL 6754063, at *10 (S.D. Fla. Dec. 22, 2011) (court found that "direct physical loss or damage" policy language did not cover replacing undamaged property to assure matching); *Harbor House Condominium Ass'n v. Massachusetts Bay Insurance Co.*, 703 F. Supp. 1313, 1317–18 (N.D. Ill. 1988) (court found that insureds failed to prove that damage to one part of pipe system caused damage to entire system).

Our focus here is on the specific contract language used here, and cases involving different contract language from different jurisdictions are not that helpful. Further, our approach leaves plenty of room for common sense in situations involving more limited damage. If one shingle at the corner of a slate roof is damaged and no matching replacement shingle is available, a building owner would not be entitled to an entire new roof. Windridge conceded as much at oral argument. Under the policy here, the building owner instead would be entitled to compensation for the (presumably minor) decrease in value of the building due to one non-matching shingle.[7] By contrast, the decrease in value would be significant if a building were left with zebra-striped siding. In that case, the insurer would almost certainly choose to pay to

---

[7] The policy here gave Philadelphia Indemnity the option of paying the value of lost or damaged property. If one shingle in the corner of a roof were damaged and a perfectly-matching shingle were not available on the market, Philadelphia Indemnity could pay for a repair and for the minor reduction in value of the property resulting from one mismatched shingle in the corner.

replace the siding rather than compensate the building owner for the reduction in value of its building.

Each building here suffered a direct physical loss, which was caused by or resulted from the hail and wind storm, and Philadelphia Indemnity therefore must pay to return the buildings to their pre-storm status—i.e., with matching siding on all sides. Windridge seeks only to be put back in the position it was in before the storm. Having mismatched siding on its buildings would not be the same position. Since no matching replacement siding is available, Philadelphia Indemnity must pay to replace all of the siding on Windridge's buildings.

The district court's judgment in favor of Windridge is AFFIRMED.